# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDUARDO SANDOVAL-VELA,<br><br>                        Petitioner,<br>vs.<br><br>JANET NAPOLITANO, Secretary of the Department of Homeland Security; ERIC HOLDER, Attorney General; ROBIN F. BAKER, Director of San Diego Field Office, U.S. Immigration and Customs Enforcement; and ERIC NOONAN, Warden, Western Regional Detention Facility,<br><br>                        Respondents. | CASE NO. 10-CV-0059 - IEG (RBB)<br><br>ORDER DENYING EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL<br><br>[Doc. No. 19] |

On January 26, 2010, the Court issued an order denying Petitioner's ex parte application for a preliminary injunction. [Doc. No. 18]. Currently before the Court is Petitioner's Emergency Motion to stay the execution of that order pending appeal. [Doc. No. 19]. Having considered the parties' arguments, the Court **DENIES** Petitioner's Emergency Motion.

## BACKGROUND

### I.    Factual background

Petitioner Eduardo Sandoval-Vela was born in Mexicali, Baja California, Mexico on April 17, 1973. He claims derivative United States citizenship through his father, Eduardo Sandoval-Salgado. Mr. Sandoval-Salgado was born in Mexico on September 20, 1952, and received his U.S. certificate

1  of citizenship on January 2, 1981. Mr. Sandoval-Salgado derived his United States citizenship through
2  his father, Mr. Benito Sandoval, who was born in Venice, California on August 28, 1926.

3  It appears Mr. Sandoval-Salgado came to the United States sometime in 1961 or 1962 to live
4  with his aunt, Gloria Sandoval de Feria, and to receive medical treatment for meningitis. Medical
5  records from the Orthopedic Hospital in Los Angeles establish that Mr. Sandoval-Salgado was
6  admitted as a patient to that hospital on December 5, 1962. According to the declaration of his aunt,
7  Mr. Sandoval-Salgado resided with her "until at least 1964 and most likely until 1966 or 1967."
8  (Gloria Sandoval de Feria Decl. ¶ 10 [Doc. No. 1, Ex. F].) According to Mr. Sandoval-Salgado, he
9  resided with his aunt until 1967 or 1968. (Eduardo Sandoval-Salgada Decl. ¶ 11 [Doc. No. 1, Ex. G].)
10 Afterwards, Mr. Sandoval-Salgado allegedly moved to Calexico, California to work for Ms. Josephine
11 Quan. According to Mr. Sandoval-Salgado, during this time he lived with Ms. Quan in Calexico. (Id.
12 ¶ 18.) Mr. Sandoval-Salgado married Petitioner's mother in 1972 and by 1973 already moved back
13 to Mexico, where Petitioner was born. (Id. ¶ 25.)

14 **II.     Petitioner's prior immigration and criminal history**

15 Petitioner immigrated to the United States on November 4, 1981. On April 29, 1996, he was
16 convicted of possession of marijuana with intent to distribute and sentenced to twenty-one months in
17 prison and three years of probation. On August 15, 1996, the Immigration and Naturalization Service
18 ("INS") commenced deportation proceedings against Petitioner. Petitioner notified the Immigration
19 Court that he wished to assert his United States citizenship as a defense to the deportation. In light of
20 that, the Immigration Judge ("IJ") terminated the deportation proceedings. On May 17, 1997,
21 Petitioner applied for a certificate of citizenship. However, on July 1, 1997, he withdrew the
22 application allegedly due to his inability to provide additional evidence requested by the INS.
23 Accordingly, on July 15, 1997, the INS reinstated removal proceedings, and on July 25, 1997, the IJ
24 ordered Petitioner removed. Petitioner waived appeal and was removed to Mexico on the same day.

25 Petitioner subsequently reentered the United States in 1998 and/or 2000, and in mid-2001 he
26 re-applied for a certificate of citizenship. Petitioner, however, withdrew that application as well.
27 Between 2003 and 2004, Petitioner was convicted of several crimes. On January 4, 2005, the
28 Department of Homeland Security ("DHS") again commenced removal proceedings against Petitioner.

1  On January 13, 2005, the IJ ordered Petitioner removed from the United States to Mexico. Petitioner
2  again waived appeal, and was removed on the same day. Petitioner re-entered the United States on
3  July 4, 2005, and was granted voluntary return to Mexico sometime after September 26, 2005.

4  On August 12, 2008, Petitioner was convicted of providing a false statement on a DMV form
5  and was sentenced to nine days in jail and three years of summary probation. Meanwhile, on August
6  7, 2008, the DHS lodged a detainer with the Imperial County jail, where Petitioner was being held at
7  the time, to ensure his release to the DHS custody. On October 22, 2008, the DHS served Petitioner
8  with a Notice of Intent to reinstate the January 13, 2005 removal order. On December 15, 2008,
9  Petitioner was allegedly transferred to DHS custody and the matter was referred to the U.S. Attorney's
10 Office for prosecution under 8 U.S.C. § 1326. On May 22, 2009, the United States and Petitioner
11 agreed to a deferred prosecution whereby Petitioner would apply for a certificate of citizenship.

12 On June 16, 2009, Petitioner re-applied for a certificate of citizenship, providing new sworn
13 declarations from his father, his father's aunt, and his father's cousin. On November 9, 2009, the U.S.
14 Citizenship and Immigration Services ("USCIS") denied the application, and Petitioner appealed to
15 the Administrative Appeals Office ("AAO"). That appeal is currently pending. On January 7, 2010,
16 the government moved to dismiss without prejudice charges in the pending criminal case. On January
17 8, 2010, Judge Moskowitz granted the motion to dismiss criminal charges, and Petitioner was released
18 from custody on January 11, 2010. Petitioner has remained out of custody since then.

19 **III.   Procedural history**

20 Petitioner commenced the present action on January 8, 2010, by filing a Petition for Writ of
21 Habeas Corpus pursuant to 22 U.S.C. § 2241, seeking relief from DHS detention on the basis that he
22 is a United States citizen who derived citizenship from his father. [Doc. No. 1]. Petitioner bases his
23 derivative citizenship claim on Section 301(a)(7) of the Immigration and Naturalization Act ("INA"),
24 which at the time of Petitioner's birth provided that a person shall be a national or citizen of the United
25 States if he or she was born to a United States parent "who, prior to the birth of such person, was
26 physically present in the United States . . . for a period or periods totaling not less than ten years, at
27 least five of which were after attaining the age of fourteen years." 8 U.S.C. § 1401(a)(7) (1973).
28 According to Petitioner, his father met that criteria because he resided in the United States from 1961

to 1973 prior to Petitioner's birth in 1973. As a result, because he is a United States citizen, Petitioner argues his detention violates (1) the Non-Detention Act, 18 U.S.C. § 4001; (2) the INA; and (3) the Due Process Clause of the Fifth Amendment.

Petitioner seeks a Court order that would, among other things: (a) enjoin Respondents from enforcing the immigration detainer; (b) declare that Respondents' arrest and detention of Petitioner violates the Non-Detention Act, the INA, and the Due Process Clause; (c) enjoin Respondents from arresting and/or detaining Petitioner in the future without first disproving his claim to citizenship by clear and convincing evidence at a hearing before a neutral arbiter; and (d) enjoin Respondents from reinstating Petitioner's prior removal order(s). (Habeas Petition ¶ 31.)

Together with his petition, Petitioner submitted an Ex Parte Application for a Temporary Restraining Order ("TRO") and a Preliminary Injunction, asking the Court to enjoin Respondents from executing the immigration detainer and to prohibit them from entering a reinstatement of a previous deportation order. [Doc. No. 2]. The Court granted his request for a TRO on the same day and ordered Respondents to show cause why a preliminary injunction should not be entered. [Doc. No. 4]. In their opposition to injunctive relief, Respondents argued the Court should dismiss the case as moot due to Petitioner's release from custody. The Court held a hearing on January 22, 2010, at which time it ordered the TRO to be extended through January 26, 2010. [Doc. No. 13].

At the hearing, Respondents stated their intent to file supplemental exhibits. After the hearing, counsel for Respondents provided a copy of the supplemental exhibits to the Court and to Petitioner. The exhibits related to the new removal proceedings to be commenced against Petitioner, and were intended to be served on Petitioner after the hearing.[1] The Court directed Respondents to electronically file the documents, so that they can become a part of the record. Respondents did so on January 25, 2010. [See Doc. No. 16]. Petitioner subsequently filed an ex parte motion seeking an opportunity to respond to the supplemental exhibits submitted by Respondents. [Doc. No. 14]. The Court denied Petitioner's request, concluding Petitioner had a meaningful opportunity to respond to the substance of the supplemental exhibits both in his reply and at the hearing, and noting that in any event there was

[1] The exhibits consisted of a "Notice of Entry of Appearance as Attorney or Representative," "Notice to Appear," "Notice of Consequences of Failure to Appear," "Warrant for Arrest of Alien," "Notice of Custody Determination," and "Order of Release on Recognizance." [See Doc. No. 16].

1  no resulting prejudice to Petitioner in the Court considering the exhibits. [Doc. No. 17].

2      The Court subsequently issued an order concluding the case was not moot because Petitioner
3  was still "in custody" for purposes of Section 2241, or was nevertheless subject to "collateral
4  consequences" of the prior detention. (Jan. 26, 2010 Order, at 12 [Doc. No. 18].) The Court, however,
5  denied the application for a preliminary injunction because Petitioner failed to show an irreparable
6  injury, and dissolved the previously-entered TRO. (Id.) The Court also stayed the proceedings on the
7  merits in this case pending the resolution of Petitioner's administrative appeal to the AAO. (Id.) It is
8  the execution of this order that Petitioner now seeks to stay pending appeal.

9  **LEGAL STANDARD**

10      Petitioner brought the present motion pursuant to Fed. R. App. P. 8 and Ninth Circuit Rule 27-
11  3. (Em. Motion, at 1.) As applicable here, Rule 8 provides that a party asking the court of appeals for
12  a stay or injunction pending appeal "must ordinarily move first in the district court" for that relief.
13  FED. R. APP. P. 8(a)(1)(C). Federal Rules of Appellate Procedure, however, govern only the procedure
14  in the courts of appeals. See FED. R. APP. P. 1(a)(1). Where the rules "provide for filing a motion or
15  other document in the district court, the procedure must comply with the practice of the district court."
16  FED. R. APP. P. 1(a)(2). In the present case, the Court construes Petitioner's emergency motion as a
17  motion pursuant to Fed. R. Civ. P. 62(c), which expressly allows a district court to grant an injunction
18  pending appeal "from an interlocutory order or final judgment that . . . denies an injunction."

19      A party seeking a stay of a state action that the district court has declined to enjoin must
20  demonstrate: (1) "a strong showing that he is likely to succeed on the merits;" (2) an "irreparable
21  injury absent a stay;" (3) that the issuance of a stay would not substantially injure the other interested
22  parties; and (4) that the stay is in the public interest. Cal. Pharmacists Ass'n v. Maxwell-Jolly, 563
23  F.3d 847, 849-50 (9th Cir. 2009) (citation omitted). This standard is akin to the one used in deciding
24  whether a preliminary injunction should be issued. See id. at 849 (citing Winter v. Nat. Res. Def.
25  Council, Inc., --- U.S. ---, 129 S.Ct. 365, 376 (2008)).

26  ///
27  ///
28  ///

**DISCUSSION**

**I.     Success on the merits of the appeal**

In order to prevail on his motion for a stay pending appeal, Petitioner has to demonstrate "a strong showing that he is likely to succeed on the merits" of his appeal. See Cal. Pharmacists, 563 F.3d at 849-50 (citation omitted). Accordingly, Petitioner bears a heavy burden of demonstrating that the court of appeals will overturn this Court's order denying preliminary injunction. The court of appeals reviews a grant or denial of a preliminary injunction under the abuse of discretion standard. Ashcroft v. ACLU, 542 U.S. 656, 664 (2004) (citation omitted). This Court's factual determinations, including its findings on irreparable injury, are reviewed for clear error, and will not be overturned "as long as [the] findings are plausible in light of the record viewed in its entirety." See Nat. Wildlife Fed'n v. Nat. Marine Fisheries Serv., 422 F.3d 782, 795 (9th Cir. 2005) (citation omitted); see also CytoSport, Inc. v. Vital Pharmaceuticals, Inc., 617 F. Supp. 2d 1051, 1085 (E.D. Cal. 2009). This Court's legal rulings are reviewed *de novo*. See Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 428 (2006) (citation omitted).

   A. Legal standard governing a preliminary injunction

A party seeking a preliminary injunction must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter, 129 S.Ct. at 374 (citations omitted); accord Stormans, Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009) (citing Winter, 129 S.Ct. at 374). A preliminary injunction will not issue, even if a party has demonstrated likelihood of success on the merits, if the party cannot make a "clear showing" that the alleged irreparable injury is likely, rather than merely "possible." See Winter, 129 S.Ct. at 375-76.

   B. Analysis on "irreparable injury"

In its order denying preliminary injunction, the Court concluded Petitioner failed to show that irreparable injury is likely absent injunctive relief. In doing so, the Court noted that Petitioner's ex parte application alleged only that he will suffer irreparable injury in one of two ways: (1) he will be unlawfully deprived of at least 48 hours of liberty because of the immigration detainer and/or DHS's decision to take him into custody, and (2) the DHS might elect to reinstate his previous deportation

order and physically remove him from the country. However, in light of Respondents' decision to institute new removal proceedings against Petitioner, rather than reinstate the prior order of removal, and their decision to release him on his own recognizance pending the removal proceedings, the Court concluded Petitioner could not demonstrate that any future detention and/or reinstatement of a prior removal order was more than a "possibility," which is insufficient to warrant injunctive relief. See Winter, 129 S.Ct. at 375-76. According, the Court denied the application for a preliminary injunction.

For the most part, Petitioner's current motion rehashes the same arguments raised previously. First, Petitioner argues he suffers continuing irreparable injury due to DHS's imposition of restrictions and conditions on his release.[2] According to Petitioner, being "in custody" for habeas purposes is a violation of his due process rights because it is a "significant restraint on his liberty 'not shared by the public in general.'" (Em. Motion, at 9-10 (citing Dow v. Cir. Ct. of the First Circuit, 995 F.2d 922, 923 (9th Cir. 1993) (per curiam)).) Second, Petitioner argues there is no evidence in the record that Respondents have withdrawn or cancelled the prior notice of reinstatement of the order of removal or the warrant of removal. Thus, the Warrant of Removal dated August 11, 2008 still allegedly commands any immigration officer "to take into custody and remove from the United States" Petitioner, as a person "subject to removal/detention from the United States, based upon a final order by . . . an immigration judge." (See Respondents' Exs., at 123 [Doc. No. 12].) Third, Petitioner argues that contrary to Respondents' averments, they do not have discretion in not detaining him absent a preliminary injunction because under 8 U.S.C. 1226(c), detention of certain aliens is *mandatory*. Finally, Petitioner appears to argue that even if his detention is not mandatory under Section 1226(c), his release on his own recognizance is nonetheless discretionary under Section 1226(b), and therefore DHS can potentially revoke his release at any time without a reason. (See Em. Motion, at 10-11.)

### i. *Restrictions and conditions*

According to Petitioner, "when deprivation of a constitutional right is involved, no further

---

[2] Petitioner's release is expressly conditioned on complying with a number of conditions, including: (1) reporting for any hearing or interview as directed by the DHS; (2) reporting once in person to a deportation officer for processing; and (3) inability to change his place of residence without first securing written permission from an immigration officer. (Respondents' Supp. Exs., at 173.) Failure to comply with these conditions may result in revocation of the release as well as Petitioner's arrest and detention by the DHS. (Id.)

1  showing of irreparable injury is needed to merit extraordinary relief." (Id. (citing cases).) Petitioner
2  relies on Easyriders Freedom F.I.G.H.T. v. Hannigan, 92 F.3d 1486 (9th Cir. 1996), in arguing that
3  the harm is complete when the constitutional right is infringed–which, in this case, occurred when the
4  reporting requirements and restrictions were imposed. However, the Ninth Circuit's decision in
5  Easyriders is easily distinguished. The issue there was the state's practice of issuing citations for
6  technical helmet violations when the citing officer did not have probable cause to believe the cited
7  individual had knowledge of the helmet's non-compliance with the law. According to the court, this
8  amounted to "irreparable injury" at its inception because it violated the Fourth Amendment, whose
9  purpose was "'to prevent unreasonable governmental intrusions into the privacy of one's person,
10 house, papers, or effects.'" Id. at 1501 (quoting United States v. Calandra, 414 U.S. 338, 354 (1974)).

11 In the present case, however, Petitioner cannot point to anything that would excuse him from
12 the routine reporting requirements and restrictions at issue here while he is still considered to be an
13 "alien" subject to removal proceedings. Contrary to Petitioner's arguments, the Court has to presume
14 that he is an "alien" until contrary is shown or determined. See Scales v. I.N.S., 232 F.3d 1159, 1163
15 (9th Cir. 2000) (stating that in the context of removal proceedings, evidence of foreign birth "gives
16 rise to a rebuttable presumption of alienage" (citations omitted)). Although the Fifth and Fourteenth
17 Amendments protect aliens, as well as citizens, within the United States from deprivation of life,
18 liberty, or property without due process of law, that does not mean "all aliens must be placed in a
19 single homogeneous legal classification." Mathews v. Diaz, 426 U.S. 67, 77-78 (1976) (citations
20 omitted). Rather, as an alien, Petitioner can constitutionally be subjected to requirements and
21 restrictions "that would be unacceptable if applied to citizens." Id. at 79-80 ("In the exercise of its
22 broad power over naturalization and immigration, Congress regularly makes rules that would be
23 unacceptable if applied to citizens."). Thus, unlike in Easyriders, 92 F.3d at 1501, Petitioner cannot
24 demonstrate that the challenged state action is unconstitutional as currently applied. Accordingly, he
25 cannot demonstrate the reporting requirements and restrictions amount to an "irreparable injury."

26         *ii.       Notice of Intent to Reinstate Prior Order*

27 Petitioner also argues there is no evidence that Respondents have rescinded the August 11,
28 2008 notice of intent to reinstate the prior order of removal. However, Respondents attached to their

opposition a copy of that Notice of Intent, which indicates that it was formally rescinded effective January 28, 2010 at 5:30 p.m. (See Respondents' Exs., at 175.) Accordingly, because the reinstatement of the prior removal order is no longer even "possible," not to mention likely or certain, Petitioner cannot demonstrate that it amounts to an "irreparable injury." See Winter, 129 S.Ct. at 375-76.

      *iii.*   *"Mandatory" detention under Section 1226(c)*

Petitioner next argues that even if Respondents wanted to release him on his own recognizance, they are bound by Section 1226(c) to take him into custody. Section 1226(c) provides:

> The Attorney General *shall* take into custody any alien who--
>
> > (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
> >
> > (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
> >
> > (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence [FN1] to a term of imprisonment of at least 1 year, or
> >
> > (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,
>
> when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

8 U.S.C. § 1226(c) (emphasis added). At a first glance, this section applies to Petitioner because he was originally charged as being deportable pursuant to Section 1227(a)(2)(B)(i), as an alien who had been convicted of a controlled substance offense, and Section 1227(a)(2)(A)(iii), as an alien who has been convicted of an aggravated felony offense. (See Respondents' Exs., at 21-25, 27-32.)

However, Section 1226(c) is inapplicable here because it only requires Attorney General to take such an alien into custody "*when* the alien is released." See 8 U.S.C. § 1226(c) (emphasis added). Numerous courts have concluded that Section 1226(c) does not apply when the alien was not taken into immigration custody at the time of his release from incarceration on the underlying criminal charge. See, e.g., Bromfield v. Clark, No. C06-757RSM, 2007 WL 527511, at **3-5 (W.D. Wash. Feb. 14, 2007) (collecting cases); see also Alikhani v. Fasano, 70 F. Supp. 1124, 1130-31 (S.D. Cal. 1999) (concluding the statute applied only to aliens released on or after October 10, 1998, and only to aliens that were "detained at the time of release"). As one district court has explained:

> "the clear language of the statute indicates that the mandatory detention of aliens 'when' they are released requires that they be detained at the time of release." Thus, if Congress had intended for mandatory detention to apply to aliens at any time after they were released, it easily could have used the language "*after* the alien is released," "regardless of when the alien is released," or other words to that effect. Instead, Congress chose the word "when," which connotes a much different meaning.

Quezada-Bucio v. Ridge, 317 F. Supp. 2d 1221, 1231 (W.D. Wash. 2004) (internal citations omitted). Similarly, another district court concluded that "the mandatory detention statute . . . [did] not apply to an alien such as petitioner, who has been taken into immigration custody well over a month after his release from state custody." Waffi v. Loiselle, 527 F. Supp. 2d 480, 488 (E.D. Va. 2007). As that court has explained:

> The term "when" includes the characteristic of "immediacy," referring in its primary conjunctive sense, to action or activity occurring "at the time that" or "as soon as" other action has ceased or begun. . . . . Additionally, it would be contrary to the plain language of section 236(c)'s command that the Attorney General take into immigration custody certain criminal aliens "when" those aliens are released from state custody to include those aliens who had "already" been released from state custody. Moreover, statutory language should not be construed in a way that renders a term surplusage.

Id. (internal citations omitted).

This Court agrees, and holds that the mandatory detention of Section 1226(c) does not apply to an alien who, like Petitioner here, has "already" been released from government custody when the DHS decides to detain him. Moreover, Section 1226(c) is also inapplicable to an alien whose release from incarceration on the underlying criminal charge occurred before the effective date of the Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA"), which enacted that section. See Alikhani, 70 F. Supp. at 1130-31 (noting that Section 1226(c) applied only prospectively from October 10, 1998, which was the effective date of the IIRIRA). In the present case, Petitioner is "deportable" because of his April 29, 1996 conviction for possession of marijuana with intent to distribute. (See Respondents' Exs., at 21-25, 27-32, 50.) Petitioner was released from custody on *that* charge on July 25, 1997 at the latest, which was when he was removed to Mexico. (See id. at 61-63.) Because he was released from custody prior to the effective date of the IIRIRA, Petitioner is not subject to the mandatory detention under Section 1226(c). Accordingly, he cannot demonstrate "irreparable injury" on this ground either.

> *iv.   "Discretionary" detention under Section 1226(b)*

Finally, Petitioner appears to argue that even if his detention is not mandatory under Section

1226(c), his release on his own recognizance is nonetheless discretionary under Section 1226(b), and therefore DHS can potentially revoke his release at any time at its discretion.[3] However, in light of Respondents' willingness in the past to work with Petitioner while he pursues the resolution of his derivative citizenship claim, the chance that his release on his own recognizance might be revoked without a reason is no more than a "possibility," which is insufficient to warrant injunctive relief. See Winter, 129 S.Ct. at 375-76. Moreover, brief detention of aliens pending removal proceedings is constitutional. See, e.g., Demore v. Kim, 538 U.S. 510, 523 (2003) ("[T]his Court has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process."); Casas-Castrillon v. Dep't of Homeland Sec., 535 F.3d 942, 950-51 (9th Cir. 2008) (concluding that while "brief" detention without procedural protections may be constitutional, Congress did not intent to authorize the long-term detention of legal permanent residents without providing them access to a bond hearing before an I.J.). Accordingly, even if Petitioner's release could be revoked at any time without a reason, that does not give rise to an "irreparable injury."[4]

### C. Conclusion

Without being able to demonstrate that he will be subject to an "irreparable injury" absent injunctive relief, Petitioner cannot demonstrate that this Court has abused its discretion in denying his ex parte application for a preliminary injunction. See CytoSport, 617 F. Supp. 2d at 1085. Accordingly, Petitioner failed to make a "strong showing" that he is likely to succeed on the merits of his appeal. See Cal. Pharmacists, 563 F.3d at 849-50.

## II. Irreparable injury absent a stay

For the same reasons as discussed above, Petitioner cannot demonstrate that he will suffer an irreparable injury absent a stay. As already noted, Respondents rescinded the August 11, 2008 notice

---

[3] Section 1226(b) provides that "[t]he Attorney General at any time may revoke a bond or parole authorized under subsection (a) of this section, rearrest the alien under the original warrant, and detain the alien." 8 U.S.C. § 1226(b).

[4] As the Ninth Circuit held, if Petitioner is at any time taken into actual *physical custody* while his removal proceedings are still pending, he will be entitled to an immediate review of his derivative citizenship claim in the district court. See Flores-Torres v. Mukasey, 548 F.3d 708, 712-13 (9th Cir. 2008) (concluding that the district court has jurisdiction to adjudicate non-frivolous claims of citizenship brought by detained aliens, even where the removal proceedings are not yet completed). However, nothing in Flores-Torres mandates that an "alien," such as Petitioner, can never be taken into custody while his removal proceedings are ongoing or must be released from custody while the district court determines his claim to citizenship.

of reinstatement of the prior order of removal. In addition, contrary to Petitioner's arguments, he is not subject to mandatory detention pursuant to Section 1226(c). Finally, having been born in Mexico, Petitioner is presumed to be an "alien," and as such can constitutionally be subjected to brief detention and/or certain restrictions during his release pending removal proceedings.

### III. Remaining factors

Because Petitioner cannot demonstrate success on the merits or irreparable injury absent a stay, the Court need not consider the remaining factors.

### CONCLUSION

Accordingly, the Court **DENIES** Petitioner's Emergency Motion for Injunction Pending Appeal. The Court's order of January 26, 2010 shall remain in effect.

**IT IS SO ORDERED.**

**DATED: January 29, 2010**

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**